UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DEANNA L. PUSKAS,**

    **Plaintiff,**

v.

**DELAWARE COUNTY,** et al.,

    **Defendant.**

:

:

Case No. 2:19-cv-2385
**Judge Sarah D. Morrison**
**Magistrate Judge Elizabeth Preston Deavers**

## OPINION AND ORDER

This matter is before the Court for consideration of the Motion for Summary Judgment filed by Defendants Deputy Zachary Swick, Deputy Troy Gibson, and Sergeant Robert Spring ("Individual Defendants") and Delaware County, Ohio. (Mot., ECF No. 89.) Plaintiff Deanna Puskas as Administrator of the estate of Brian Puskas responded (Resp., ECF No. 90), and Defendants replied. (Reply, ECF No. 93.) For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED**.

**I.    STATEMENT OF FACTS**

Although the Court construes disputed facts in the light most favorable to Mrs. Puskas, *see Davenport v. Causey*, 521 F.3d 544, 546 (6th Cir. 2008), it relies heavily on the video footage in the record that depicts the tragic events summarized below. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (establishing the high value of video footage in resolving factual disputes between the parties).

1

On June 6, 2018, Mrs. Puskas called 911 to report that her husband, Mr. Puskas, was acting abnormally at their home in Delaware County. (ECF No. 58-9, Strohl Decl., PageID 761; Exh. 29, 911 Call, 0:10–0:20.) His abnormal behavior included throwing things around the yard, tearing up the house, "cut[ting] a window open," and threatening Mrs. Puskas with "guns and knives." (911 Call, 0:20–0:31; ECF No. 50-3, Incident Run Sheet, PageID 416.) She told the 911 dispatcher that they had "tremendous guns" in the house (911 Call, 1:18–1:21) and reported that her husband "threatened to turn [her] into an ashtray," and said that "[h]e's going to kill me. I know what he's going to do, he's going to kill me." (911 Call, 1:30–1:32; ECF No. 55, Puskas Dep., PageID 559.) Mrs. Puskas had fled to her neighbor's property. (911 Call, 2:03–2:10.)

Deputy Swick was dispatched on the domestic violence call and was the first law enforcement officer to arrive; he was informed that Mr. Puskas had threatened Mrs. Puskas with weapons. (ECF No. 52, Swick Dep., PageID 467, 471.) As Deputy Swick approached the scene in his cruiser, he saw various items strewn about the yard and Mr. Puskas holding a rifle. (*Id.*, PageID 466; ECF No. 49-2, Mulford Report, PageID 391; Exh. M, Swick Body Camera, 3:04–3:06.) Before Deputy Swick exited his cruiser, Mr. Puskas placed the rifle on the ground. (ECF No. 49-2, PageID 391; See, Swick Dep., PageID 466.)

Deputy Swick exited his cruiser and repeatedly ordered Mr. Puskas to put his hands up and to get on the ground. (Swick Body Camera, 3:11–3:59.) Mr. Puskas did not comply and instead walked toward the house, away from Deputy Swick. (*Id.*,

2

3:28–3:59.) Mr. Puskas then stopped by a tree in front of his house, picked up a bag, and pulled out a shotgun. (*Id.*, 3:51–4:01; ECF No. 49-2, Mulford Report, PageID 391.) Upon seeing this, Deputy Swick retreated to his cruiser; during his retreat his body camera fell off. (Swick Body Camera, 4:01–4:06.) At the same time, Mr. Puskas yelled at Deputy Swick "yeah, you better run." (*Id.*) Mr. Puskas then threw the shotgun to the ground. (ECF No. 49-2, Mulford Report, PageID 391.) Deputy Swick radioed dispatch to report that Mr. Puskas had a shotgun and that there were multiple weapons lying in the yard. (Incident Run Sheet, PageID 418).

Still on his own, Deputy Swick attempted to verbally engage Mr. Puskas by asking "what's going on" and calmly talking to him about depression. (Swick Body Camera, 4:19, 6:48–7:20). When Officer Brown arrived, he joined Deputy Swick by Swick's cruiser. (Ex. 39, Brown Body Camera, 8:00–8:17.) Together they attempted to reason with Mr. Puskas. (*Id.*, 8:17–10:50.) Mr. Puskas twice showed signs of acquiescence to Officer Brown's commands to come toward them and surrender, but he did not comply. (*Id.*, 8:50–9:07; 13:40–13:45.) Mr. Puskas was repeatedly warned not to pick up the guns lying in the yard as he continually paced. (*Id.*, 10:45–10:53, 15:28.) Mr. Puskas was very agitated. (*Id.*, 8:17–16:40.) As Deputy Swick and Officer Brown continued talking to Mr. Puskas, Sgt. Spring and Deputy Gibson arrived on the scene. (*Id.*, 14:50–15:00; Exh. O, Gibson Body Camera, 1:15–1:29.)

When Deputy Gibson saw Mr. Puskas's behavior, he retrieved his canine, Cash, from the cruiser and ordered Mr. Puskas to walk toward the officers in the street. (Gibson Body Camera, 1:33–1:58.) However, Mr. Puskas remained

3

noncompliant with police orders. (*Id.*, 1:50–3:34.) Deputy Gibson then warned Mr. Puskas that he was going to get bit if he did not comply with their instructions. (*Id.*, 3:30–3:36; Brown Body Camera, 16:35–16:42.) Mr. Puskas ignored this warning, and instead turned and ran toward his house. (*Id.*) Believing that numerous firearms were inside the house, Deputy Gibson released Cash to apprehend Mr. Puskas. (*Id.*; ECF No. 53-4, Gibson Dep., PageID 528.) As Cash was released, the Individual Defendants began pursuing Mr. Puskas across the yard. (Gibson Body Camera, 3:36–3:40; Brown Body Camera, 16:44–16:54.)

Cash did not make physical contact with Mr. Puskas. (Gibson Body Camera, 3:40–3:50.) Rather, as Cash and the Individual Defendants closed in on Mr. Puskas, Mr. Puskas stopped and retrieved a pistol case that was lying in the yard. (*Id.*, 3:45–3:48.) Mr. Puskas unzipped the case, causing someone to yell "he's got a pistol" and Deputy Swick and Sgt. Spring to yell for Mr. Puskas to "drop it" and "get off that." (*Id.*, 3:45–3:50.) Mr. Puskas pulled out a silver revolver causing the Individual Defendants to open fire, killing him. (*Id.*, 3:48–3:53.) At that moment, the Individual Defendants feared for the lives of everyone on the scene. (ECF No. 51-1, Spring Dep., PageID 447–48; ECF No. 52-3, Swick Dep., PageID 477; ECF No. 53-3, Gibson Dep., PageID 522–23.)

Mrs. Puskas filed suit against Defendants in June 2019. Her original complaint asserted three claims stemming from the shooting death of her late husband: (1) 18 U.S.C. § 1983 claims based on the Fourth and Fourteenth Amendments; (2) a wrongful death claim under Ohio Rev. Code § 2125.01; and (3) a

4

common law tort claim for intentional infliction of emotional distress. (Compl., ECF No. 1.) Defendants moved for summary judgment on these claims, but the Court denied the motion as moot after Mrs. Puskas was granted leave to file an Amended Complaint. (Not. Order, ECF No. 65.)

Mrs. Puskas brought the same claims in her Amended Complaint but added Lieutenant Robert Buttler as an additional defendant. (Am. Compl., ECF No. 64.) Defendants filed a Motion to Dismiss all claims against Lt. Buttler, which the Court granted. (Opinion and Order, ECF No. 84, PageID 890.) The parties then engaged in discovery and the matter is now before the Court on Defendants' Motion for Summary Judgment. (ECF No. 89.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III. ANALYSIS

### A. Mrs. Puskas's § 1983 Claims

Mrs. Puskas's § 1983 claims against the Individual Defendants are based on their alleged use of excessive force when they (1) released Cash to chase Mr. Puskas, and (2) used deadly force. Her § 1983 claim against Delaware County alleges its policies regarding canine units and less-lethal force led to the constitutional violations suffered by Mr. Puskas.[1] (See ECF No. 84, Opinion and Order, PageID 886.)

#### 1. § 1983 Claims Against the Individual Defendants

The Individual Defendants argue they are entitled to summary judgment on

---

[1] Mrs. Puskas also alleges in her Amended Complaint that Defendants violated Mr. Puskas's right to equal protection under the law. (Am. Compl., ¶ 69.) However, she fails to address Defendant's summary judgment arguments on this issue in her Response in Opposition. This failure constitutes an abandonment of the claim. *Brown v. VHS of Michigan, Inc.*, 545 Fed.Appx. 368, 372 (6th Cir. 2013) (collecting Sixth Circuit cases affirming grants of summary judgment when non-movant fails to defend a claim in response to summary judgment motion).

Mr. Puskas' excessive force claims because their use of force was justified (*i.e.*, not a violation of Mr. Puskas' constitutional rights) and because they are entitled to qualified immunity. (Mot., PageID 995.)

"When the defendant raises qualified immunity, the plaintiff bears the burden of proving that the defendant is not entitled to summary judgment." *Davenport*, 521 F.3d at 550. Qualified immunity is intended to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Accordingly, "it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). An official is entitled to the defense of qualified immunity so long as he has not violated a "clearly established statutory or constitutional right[] of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). The analysis typically involves two steps: (1) determine "whether the facts . . . shown . . . make out a violation of a constitutional right," and (2) determine whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Because the Court finds that the facts do not make out any violations of Mr. Puskas' constitutional rights, it need not address the second step. *See Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018) ("These two prongs [(steps)] may be addressed in any order. If either prong is not met, then the government officer is entitled to qualified immunity") (citation omitted).

Mrs. Puskas alleges that the Individual Defendants violated Mr. Puskas's

clearly established constitutional right to be free from excessive force. Excessive force claims are analyzed under the Fourth Amendment's protection against unreasonable seizure. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The inquiry into the "reasonableness" of the use of force is "an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. The court "must balance the consequences of the individual against the government's interests in effecting the seizure." *Burchett v. Kiefer*, 310 F. 3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396).

### a) The Individual Defendants did not violate Mr. Puskas's constitutional rights by releasing Cash.

As a preliminary matter, the Individual Defendants argue that they did not use "excessive force" against Mr. Puskas with regard to the dog because Cash did not make physical contact with him. (Mot., PageID 1016–17.) However, the Sixth Circuit has treated an officer's decision to release a canine as an independent use of force separate from any physical contact the dog ultimately makes. *See Zuress v. City of Newark, OH*, 815 F. App'x 1, 5–6 (6th Cir. 2020). Accordingly, the Court will analyze the Individual Defendants' decision to release Cash as a use of force. *See Ashford v. Raby*, 951 F.3d 798, 801–03 (6th Cir. 2020) (applying the objectively reasonable standard to use of force involving a canine).

When Cash was released to apprehend Mr. Puskas, the Individual Defendants knew that: Mr. Puskas was suspected of domestic violence, had threatened his wife with "guns and knives," and had twice wielded firearms in the

8

presence of Deputy Swick. Mr. Puskas had been acting erratically during his encounter with the Individual Defendants, and they saw that he had ready access to firearms in the yard. Mr. Puskas had refused to surrender and resisted attempts at apprehension even after he was warned that he would be bit if he refused to comply. When Mr. Puskas turned and ran toward his house where the Individual Defendants believed more guns were located, they reasonably believed that he posed an imminent threat to the personal safety of everyone on the scene. In this situation, Cash's deployment was objectively reasonable. *See Matthews v. Jones*, 35 F.3d 1046, 1048, 1051 (6th Cir. 1994) (finding that officers were justified in using a canine for apprehension of a suspect who failed to surrender); *see also Rainey v. Patton,* 534 F. App'x 391, 397 (6th Cir. 2013) (citing *Robinette v. Barnes*, 854 F.2d 909, 913–14 (6th Cir.1988) (finding employment of canine to apprehend suspect reasonable because suspect likely "knew the building was surrounded, ... [and] had been warned.... that a dog would be used, and ... gave every indication of unwillingness to surrender")).

In an effort to avoid the application of qualified immunity, Mrs. Puskas offers three arguments – none of which are successful.

First, Mrs. Puskas disputes that a warning was given prior to Cash's release. (Resp., PageID 1077–78.) However, having reviewed the body camera footage, the Court has heard officers warning Mr. Puskas that he would get bit if he did not comply. (Gibson Body Camera, 3:30–3:36; Brown Body Camera, 16:35–16:42.) Mrs. Puskas cannot create a genuine dispute on this fact to avoid summary judgment

9

when her argument is contrary to the video footage. *Luke v. Johnson*, No. 1:17-CV-63, 2021 WL 4453635, at *8 (S.D. Ohio Sept. 29, 2021) (Cole, J.) ("The Supreme Court has held that, where a party's account is 'blatantly contradicted' by video footage, 'so that no reasonable jury could believe it,' a court should not adopt that version of events for summary judgment purposes." (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Pennington v. Terry*, 644 F. App'x 533, 540–41 (6th Cir. 2016). Moreover, even if there were a genuine dispute over whether a warning was given, it was reasonable for the Individual Defendants to release Cash given the volatile situation and Mr. Puskas's access to firearms in the yard. *See Miller v. Rybicki*, 259 F. Supp. 3d 688, 698–99 (E.D. Mich. 2017) (finding that an officer did not have to warn a potentially armed and dangerous suspect prior to releasing a canine to bite him).

Second, Mrs. Puskas suggests that Deputy Swick "could have tased [Mr. Puskas]" prior to Cash's release when he was the only officer on the scene. (Resp., PageID 1044, 1073.) However, "the Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances." *Davenport*, 521 F.3d at 552 (6th Cir. 2008). Mr. Puskas was erratic and refused to comply with Deputy Swick's instructions from the outset, so it was reasonable that Deputy Swick first try nonconfrontational methods. Using a taser soon after arriving on site could have escalated the situation when there was still a chance of peaceful resolution. Deputy Swick's decision to forgo tasering for the

10

possibility of a nonviolent resolution was far from "plainly incompetent." *Ashcroft,* 563 U.S. at 743.

Lastly, Mrs. Puskas argues that the Individual Defendants were not in immediate danger when Cash was released because Mr. Puskas was unarmed at that time, he was not threatening them, and he was having a mental health crisis. (Resp., PageID 1077, 1087.) But these arguments ignore that Mr. Puskas had ready access to firearms in the yard, he had showed a willingness to wield those firearms, and he was running toward the house where the Individual Defendants believed more weapons were stored. The state of Mr. Puskas's mental health was an unfortunate component of these tragic events, but the Individual Defendants had to deal with the threat as they faced it.

Employing Cash was an objectively reasonable use of force, and the Individual Defendants are entitled to qualified immunity for Cash's release.

### b) The Individual Defendants did not violate Mr. Puskas's constitutional rights by using deadly force.

The use of deadly force is objectively reasonable only when an officer has "probable cause that the suspect poses an imminent danger of serious physical harm to the officer or to others." *Bouggess v. Mattingly*, 482 F.3d 886, 891 (6th Cir. 2007) (emphasis omitted). Though "the ultimate question . . . is whether [an officer's] decision to use deadly force . . . was reasonable under the totality of the circumstances," *Mitchell v. Schlabach*, 864 F.3d 416, 422 (6th Cir. 2017) (citation omitted), particular attention is paid to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and

11

whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

The Court considers whether the evidence presented demonstrates that, at the time of the shooting, the Individual Defendants acted with objective reasonableness and had probable cause to believe that Mr. Puskas posed an imminent danger of serious physical harm. This inquiry focuses on the moments preceding the Individual Defendants' use of deadly force. *See Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996).

The Individual Defendants were dispatched to the scene of a domestic violence call after Mr. Puskas threatened his wife with guns and knives. In the moments leading to the decision to use lethal force, the Individual Defendants knew that Mr. Puskas was acting erratically and had twice wielded firearms in the presence of Deputy Swick. They also knew that there were multiple firearms in the yard and believed there to be more inside the house. Mr. Puskas refused to surrender and instead ran toward his house. With Cash and the Individual Defendants in close pursuit, Mr. Puskas stopped to retrieve a gun case, unzipped it, and drew a silver revolver. At that moment, the Individual Defendants feared for the lives of everyone on scene and opened fire, killing Mr. Puskas.

Mrs. Puskas does not dispute that her husband drew a revolver before the use of deadly force. Rather, she argues that he never *brandished* the firearm at the

12

Individual Defendants and that "it was a reasonable inference Puskas was attempting to defend against the dog's pending attack on him." (Resp., PageID 1069, 1081.) This argument asks the Court to view the situation with 20/20 hindsight, which the Court will not do. *See Thornton v. City of Columbus*, 727 F. App'x 829, 836 (6th Cir. 2018) ("what constitutes reasonable action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.") (citation omitted). Regardless, it was not a necessary precondition for the use of deadly force that Mr. Puskas brandish or point the firearm at the Individual Defendants; when an officer faces an imminent threat of serious bodily harm, he need not wait and see whether the suspect posing that threat will point a gun at him. *See Wilkerson v. City of Akron, Ohio*, 906 F.3d 477, 482–83 (6th Cir. 2018) (upholding grant of qualified immunity to a police officer who shot a suspect even when the suspect was fleeing and not actively pointing his firearm at the officer). Instead, "an officer's employment of deadly force in split-second decisions when faced with a threat of serious injury or death should not be questioned." *Nelson v. City of Battle Creek*, 802 Fed. Appx. 983, 988–89 (6th Cir. 2020).

Finally, Mrs. Puskas argues that the Individual Defendants created the circumstances that led to Mr. Puskas's death and, therefore, they are not entitled to qualified immunity. (See, Resp., PageID 1069, 1075.) However, courts look only to the circumstances facing an officer at the time he used deadly force; they "do not scrutinize whether it was reasonable for the officer to 'create the circumstances.'"

*Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (citing *Livermore v. Lubelan,* 476 F.3d 397, 406 (6th Cir. 2007)).

Here, the use of deadly force was objectively reasonable under the circumstances. Accordingly, Mrs. Puskas has not carried her burden and the Individual Defendants are entitled to qualified immunity for their use of lethal force. Summary judgment is **GRANTED** to the Individual Defendants.

### 2. § 1983 Claims Against Delaware County

Section 1983 does not "incorporate doctrines of vicarious liability." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Accordingly, "[a] plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). However, "[n]o constitutional violation means no municipal liability." *Thomas,* 854 F.3d at 367 (citation omitted).

Because the Court has determined that there were no constitutional violations of clearly established rights when the Individual Defendants released Cash or used deadly force, Delaware County cannot be held liable under § 1983. Defendants' Motion for Summary Judgment is **GRANTED** as to Mrs. Puskas's § 1983 claims.

### B. Mrs. Puskas may not bring new claims by way of her Response in Opposition (ECF No. 90).

In response to Defendants' summary judgment motion, Mrs. Puskas sets forth two new theories of liability. First, she claims that the Individual Defendants

14

violated Mr. Puskas' right to adequate medical care under the Fourteenth Amendment. (Resp., PageID 1081–85.) While the Amended Complaint claims that Mr. Puskas was deprived of his right to due process under the Fourteenth Amendment (Am. Compl., ¶ 69), it contains no allegations regarding medical care. Only now does Mrs. Puskas allege specific facts implicating the right to adequate medical care. Second, she claims that handcuffing Mr. Puskas after he was shot constituted excessive force (Resp., PageID 1081–82), though she did not raise this issue in her Amended Complaint.

The Court will not consider new theories of liability or allow Mrs. Puskas to amend her Amended Complaint at this time. *See Neumann v. Plastipak Packaging, Inc.,* No. 1:11-CV-522, 2011 WL 5360705, at *11 (N.D. Ohio Oct. 31, 2011) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (citation omitted); s*ee also Guiffre v. Local Lodge No. 1124, United Steelworkers of America,* 940 F.2d 660 (6th Cir. 1991) ("A party may not rely on wholly new allegations of wrongdoing to resist a motion for summary judgment.").

C. **Mrs. Puskas' State Law Claims for Wrongful Death and Intentional Infliction of Emotional Distress**

Mrs. Puskas also asserts claims for wrongful death and intentional infliction of emotional distress under Ohio law. (Am. Compl., ¶¶ 70–71.) The Sixth Circuit "applies a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed." *Packard v. Farmers Ins. Co. of Columbus*, 423

15

F. App'x 580, 584 (6th Cir. 2011). Accordingly, Mrs. Puskas's state laws claims are **DISMISSED WITHOUT PREJUDICE** to re-filing in state court.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 89) is **GRANTED**. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket records of the United States District Court for the Southern District of Ohio.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**